EDWARD DONOVAN AND DONNA DONOVAN, FORMERLY KNOWN AS DONNA RELLINGER, PLAINTIFFS-RESPONDENTS, v. CARL BACHSTADT, DEFENDANT-APPELLANT.

Argued September 13, 1982—Decided December 9, 1982.

435

436

---

*David Zolkin* argued the cause for appellant.

*Glenn Berman* argued the cause for respondents.

The opinion of the Court was delivered by

SCHREIBER, J.

The central legal issue in this case concerns the damages to which a buyer of realty is entitled upon the breach of the executory agreement by the seller. The procedural circumstances under which the question arose are unique. The buyers, Edward Donovan and Donna Donovan, husband and wife, prevailed in a suit for specific performance in which the venue was laid in the Superior Court, Middlesex County. When the seller, Carl Bachstadt, could not perform because of a defect in title, the Donovans instituted this action for damages in the Superior Court, Monmouth County.[1] The Donovans partially succeeded in their action for damages. On their motion for summary judgment they were awarded reimbursement of their expenditures of $145.00 for a survey and $142.85 for title searches.

[1] It would have been preferable if plaintiffs had sought the alternative relief of compensatory damages in the specific performance action. *See Tevis v. Tevis,* 79 *N.J.* 422, 434 (1979); *R.* 4:27–1. Damages for breach of contract are appropriate where there has been a failure to comply with a decree for specific performance.

The first suit should have been brought in Monmouth County since the property was located there. *See R.* 4:3–2(a). Neither party raised the issue.

Having been denied compensatory damages, they appealed to the Appellate Division, which reversed and remanded for a trial on that issue. We granted the seller's petition for certification. 89 *N.J.* 403 (1982).

The plaintiffs' motion for summary judgment recited that reliance for the motion was predicated only on a memorandum submitted by counsel. However, both parties during the oral argument before the trial court relied on the pleadings, depositions of the seller and exhibits marked on the depositions.[2] Though the record is sparse, the following uncontroverted facts appear.

On December 1, 1977, Joan Lowden acquired a deed from Middletown Township to Lots 25 and 26 in Block F as shown on a certain map duly filed in the Monmouth Clerk's Office. The defendant, Bachstadt, advanced the funds for the purchase of land.* Ms. Lowden gave Bachstadt a deed to the property that he never recorded.* Bachstadt constructed a house on the property * and on January 19, 1980 entered into a contract to sell the premises to the Donovans.

The contract was on a standard form prepared by an association of realtors. Bachstadt had no attorney. The record does not disclose if the Donovans were represented at the time the contract was executed. Indeed, Bachstadt never met the Donovans until after the contract had been signed, the realtor having been the only link between the parties.

The contract recited that the purchase price was $58,900. A deposit of $5,890 was paid to and held by the broker. At the

---

[2] A party should specify on a motion for summary judgment all the matters upon which he intends to rely including the depositions, pleadings, answers to interrogatories and admissions together with affidavits. Reliance on facts stated in the brief and not otherwise established is obviously impermissible. *R.* 4:46–2.

*These facts were stated by counsel on oral argument. The cause is being remanded for a plenary trial and the plaintiffs will presumably prove these facts.

closing scheduled for May 1, 1980, the Donovans were to pay an additional $9,010 in cash and the balance was to consist of a purchase money bond or note and mortgage in the principal amount of $44,000, for 30 years, at an interest rate of 13%. The conveyance was to be made subject to easements and restrictions of record and facts disclosed in an accurate survey, provided that these would not render the title unmarketable. The contract also stated that title "shall be marketable and insurable ... by any reputable title insurance company ...." There was no liquidated damage provision.

A title search obtained by the Donovans from Lawyers Title Insurance Corporation disclosed that title was presently in Anthony and Jane Mettrich, and not in Middletown Township or Joan Lowden. This was brought to Bachstadt's attention. Middletown had foreclosed its tax lien on other property owned by the Mettrichs, but it had inadvertently failed to foreclose on Lots 25 and 26 in Block F, the land sold to Joan Lowden.

The Donovans, fully aware of the title problem, filed a complaint for specific performance and for reformation of the contract. The action was instituted by an order to show cause. The reformation issue presented and argued was whether the 13% interest rate prescribed in the contract should be reduced to 10½%. The maximum allowable rate[3] at the time the contract was executed was 10½% and that rate had been raised before the date of closing to more than 13%. The trial court entered an order reforming the contract by providing that the purchase money mortgage carry a 10½% rate and decreeing specific performance. No appeal was taken from that judgment.

When defendant could not obtain marketable title, the Donovans commenced this suit for compensatory and punitive dam-

---

[3]Although the trial court did not refer to the method of computation of the maximum allowable rate in the judgment, presumably it was in accordance with the formula in effect at the time of contracting as described in *N.J.S.A.* 31:1–1 (1979) (subsequently amended March 1981) and *N.J.A.C.* 3:1–1.1 (1979) (subsequently amended April 1980).

ages. As previously observed the trial court granted plaintiffs' motion for summary judgment. It was indisputable that the defendant had breached the agreement. The only issue was damages. The trial court held that plaintiffs were entitled under *N.J.S.A.* 2A:29–1 to recovery of their costs for the title search and survey. Plaintiffs had apparently in the interim purchased a home in Middlesex County and obtained a mortgage loan bearing interest at the rate of 13¼% per annum. Plaintiffs sought the difference between 10½% and 13¼% as compensatory damages, representing their loss of the benefit of the bargain. The trial court denied recovery because the contract was for the sale of the property and the financing "was only incidental to the basic concept."

The Appellate Division reversed. 181 *N.J.Super.* 367 (1981). It held that *N.J.S.A.* 2A:29–1 was declarative of the general common law right to recover consequential damages for breach of a contract and that the statute modified the preexisting law, which limited a realty purchaser to recovery of his deposit upon a seller's breach due to a defective title. The court concluded the statute intended that the general law of damages for breach of a contract applies and stated that the difference in interest rates could be the basis for a measure of damages depending on whether the plaintiffs "have entered into a comparable transaction for another home . . . or are likely to do so in the near future . . . ." *Id.* at 376. The Appellate Division cautioned that any award of future damages should represent the true life of the mortgage and be reduced to present value. Further, the plaintiffs should be held to a duty to mitigate. Lastly, if the proofs should demonstrate that plaintiffs have not purchased and are not likely to purchase a home in the near future, their damages would be remote and speculative. The cause was remanded for a plenary hearing.

I

The initial inquiry is whether plaintiffs are entitled to compensatory damages. We had occasion recently to discuss the

measure of damages available when a seller breaches an executory contract for the sale of real property. *St. Pius X House of Retreats v. Diocese of Camden,* 88 *N.J.* 571, 582–87 (1982). We noted that New Jersey follows the English rule, which generally limits a buyer's recovery to the return of his deposit unless the seller wilfully refuses to convey or is guilty of fraud or deceit. The traditional formulation of the English rule has been expressed by T. Cyprian Williams, an English barrister, as follows:

> Where the breach of contract is occasioned by the vendor's inability, without his own fault, to show a good title, the purchaser is entitled to recover as damages his deposit, if any, with interest, and his expenses incurred in connection with the agreement, but not more than nominal damages for the loss of his bargain. [*T.C. Williams, The Contract of Sale of Land* 128 (1930)]

In *St. Pius* we found no need to reexamine the English rule, though we raised the question whether the American rule that permits a buyer to obtain benefit of the bargain damages irrespective of the nature of the reasons for the seller's default might not be more desirable.

We also referred in *St. Pius* to *N.J.S.A.* 2A:29–1, which provides:

> When any person shall contract to sell real estate and shall not be able to perform such contract because of a defect in the title to the real estate, the person with whom such contract was made, or his legal representatives or assigns, may, in a civil action, recover from the vendor, not only the deposit money, with interest and costs, but also the reasonable expenses of examining the title and making a survey of the property, unless the contract shall provide otherwise. This section shall not preclude the recovery by the purchaser from the vendor of any other damages to which he may be entitled.

This statute modified the common law rule to enable a buyer to recover the reasonable expenses of examining the title and making a survey of the property in addition to the deposit, unless the contract provided otherwise. The last sentence in the act as originally enacted in 1915, *L.* 1915, *c.* 159, had read: "This section shall not limit the recovery where the purchaser seeks to recover for fraud and deceit." *R.S.* 2:45–1. In the general revision of Title 2 in 1951 the last sentence was modified to read: "This section shall not preclude the recovery by the purchaser from the vendor of any other damage to which he may be entitled by law." In *St. Pius,* we reasoned:

We can find no legislative history explaining this change. Since the primary thrust of the revision was procedural, it is unlikely that the Legislature intended any modification in the substantive common law. Rather, it is probable that its intent was to permit recovery under Court Rules for fraud and deceit in the same action in which the return of deposit, interest and title and survey expenses were sought.... We therefore conclude that *N.J.S.A.* 2A:29–1 has no bearing on the availability of the bargain damages. [88 *N.J.* at 587]

Thus the common law governs the measure of damages apart from those guaranteed in the statute. There is nothing in the statute that prevents the Court from adopting the American rule and awarding loss of the benefit of the bargain damages.

We are satisfied that the American rule is preferable. The English principle developed because of the uncertainties of title due to the complexity of the rules governing title to land during the eighteenth and nineteenth centuries. Oakley, "Pecuniary Compensation for Failure to Complete a Contract for the Sale of Land," 39 *Cambridge L.J.* 58, 69 (1980). At that time the only evidence of title was contained in deeds which were in a phrase attributed to Lord Westbury, "difficult to read, disgusting to touch, and impossible to understand." The reason for the English principle that creates an exception to the law governing damages for breaches of executory contracts for the sale of property is no longer valid, and the exception should be eliminated. *Cessante ratione legis, cessat et ipsa lex* (the reason for a law ceasing, the law itself ceases). *See Fox v. Snow,* 6 *N.J.* 12, 14, 22–23 (1950) (Vanderbilt, C.J., dissenting). Indeed in England the rule has been modified by placing the burden of proof on the vendor to establish that he has done everything within his power to carry out the contract. *Malhotra v. Choudhury,* [1978] 3 *W.L.R.* 825; [1979] 1 *All E.R.* 186 (C.A.).

Whether titles are clear may be ascertained by record searches. See *N.J.S.A.* 46:21–1; Jones, "The New Jersey Recording Act—A Study of its Policy," 12 *Rutgers L.Rev.* 328, 329–30 (1957). Moreover, limitation periods may be applicable. *See N.J.S.A.* 2A:14–30; 13A *N.J. Practice* (Lieberman, Abstracts and Titles) § 1643, at 140 (3d ed. 1966). Thus, it is standard practice for title examiners to search the back title for 60 years

and until a warranty deed is found in the chain of title. *Palamarg Realty Co. v. Rehac & Piatkowski,* 80 *N.J.* 446, 460 (1979). Further the parties may insert appropriate provisions in their agreements protecting them from title defects so that to a very large extent sellers may control the measure of redress.

There is no sound basis why benefit of the bargain damages should not be awarded whether the subject matter of the contract is realty or personalty. Serious losses should not be borne by the vendee of real estate to the benefit of the defaulting vendor. This is particularly so when an instalment purchase contract is involved that extends over a period of years during which the vendee makes substantial payments upon the principal, as well as extensive improvements to the property.

The innocent purchaser should be permitted to recover benefit of the bargain damages irrespective of the good or bad faith of the seller. Contract culpability depends on the breach of the contractual promise. 4 A. Corbin, Contracts §§ 943–44, at 806–08 (1951). Where, as here, the seller agreed that title would be marketable, the seller's liability should depend upon his breach of that promise.[4]

Many commentators have advocated the adoption of the American rule. 5 A. Corbin, *supra,* § 1097, at 523 (1964); 11 *S. Williston, A Treatise on the Law of Contracts* § 1399 at 524 (3d ed. 1968); D. Dobbs, *Handbook on the Law of Remedies* § 12.8, at 835–36 (1973); 3 *American Law of Property* § 11.67, at 168 (1952). English commentators have also sharply criticized the English rule and advocated permitting the buyer to recover damages for loss of profit. Oakley, *supra,* at 70; Sydenham, "The Anomalous Rule in *Bain v. Fothergill,*" 41 *The Conveyancer and Property Lawyer* 341 (1977). Many states now

---

[4]The contract was selected by the seller who had been in the business of buying property at tax foreclosure sales for improvement and resale. This was not a contract of adhesion. The seller has never contended that the contractual obligation was other than as stated and advanced no equitable justification for his non-compliance.

follow the American rule.[5]  5 A. Corbin, *supra*, § 1098, at 525–35; 11 S. Williston, *supra*, § 1399, at 524–28.

The English rule is consistent with the limitation on recovery in suits on a covenant for breach of warranty.  The damages for a buyer, who has taken title and is ousted because the title is defective, are limited to the consideration paid and interest thereon.  *Gerbert v. Trustees,* 59 *N.J.L.* 160, 180 (E. & A. 1896). There appears to be no real difference between that situation and one where the vendor who does not have good title refuses to convey.  In both cases the buyer loses the property because of a defect in the title.  The fact that one sues for breach of a warranty covenant does not justify depriving a buyer of compensatory damages to which he is justly entitled when the seller breaches the contract of sale.  Professor Corbin has suggested that any inconsistency in this respect should be resolved by awarding full compensatory damages when the action is for breach of warranty.  5 A. Corbin, *supra*, § 1098, at 533.  Moreover, an anomaly already exists, for our courts have acknowledged that a buyer may recover such damages upon a showing of the seller's bad faith.  *See Ganger v. Moffett,* 8 *N.J.* 73 (1951).

We are satisfied that a buyer should be permitted to recover benefit of the bargain damages when the seller breaches an executory contract to convey real property.  Here the defendant agreed to convey marketable title.  He made that bargained-for promise and breached it and is responsible to the plaintiff for the damages occasioned thereby.  The next question is how to compute those compensatory damages.

II

Judicial remedies upon breach of contract fall into three general categories: restitution, compensatory damages and per-

[5]The dissent recommends adoption of the Uniform Land Transactions Act, 13 *U.L.A.* 638 (1975).  No state has enacted this proposed law.

formance. Separate concepts undergird each of these remedial provisions. The rationale for restitution is to return the innocent party to his status before the contract was executed. Compensatory damages are intended to recompense the injured claimant for losses due to the breach, that is, to give the innocent party the benefit of the bargain. Performance is to effect a result, essentially other than in terms of monetary reparation, so that the innocent party is placed in the position of having had the contract performed. We have now adopted the American rule providing for compensatory damages upon the seller's breach of an executory contract to sell realty and we must examine the appropriate elements that should properly be included in an award.

"Compensatory damages are designed 'to put the injured party in as good a position as he would have had if performance had been rendered as promised.' 5 *Corbin, Contracts* § 992, p. 5 (1951)." [6]   *525 Main Street Corp. v. Eagle Roofing Co.,* 34 *N.J.* 251, 254 (1961); *see also Giumarra v. Harrington Heights, Inc.,* 33 *N.J.Super.* 178, 196 (App.Div.1954), *aff'd o.b.,* 18 *N.J.* 548 (1955); *E. Farnsworth, Contracts* 839 (1982). What that position is depends upon what the parties reasonably expected. It follows that the defendant is not chargeable for loss that he did not have reason to foresee as a probable result of the breach when the contract was made. *Hadley v. Baxendale,* 9 *Ex.* 341, 156 *Eng. Rep.* 145 (1854); *accord Crater v. Binninger,* 33 *N.J.L.* 513 (E. & A. 1869). The oft-quoted language in *Hadley* for this proposition is:

> Where two parties have made a contract, which one of them has broken, the damages which the other party ought to receive, in respect of such breach, should be such as may fairly be considered either arising naturally, *i.e.,* according to the usual course of things, from such breach of contract itself, or such as may

---

[6]The Uniform Commercial Code espouses the same goal. *N.J.S.A.* 12A:1–101. The Code directs that remedies for the breach of a contract for the sale of goods "shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed ...." *N.J.S.A.* 12A:1–106(1).

reasonably be supposed to have been in the contemplation of both parties at the time they made the contract, as the probable result of the breach of it. [9 Ex. at 354, 156 Eng. Rep. at 151]

*See Restatement (Second) of Contracts* § 351 (1981); *see also Weiss v. Revenue Building & Loan Ass'n,* 116 *N.J.L.* 208, 210 (E. & A. 1936). Further the loss must be a reasonably certain consequence of the breach although the exact amount of the loss need not be certain. *Kozlowski v. Kozlowski,* 80 *N.J.* 378, 388 (1979); *Tessmar v. Grosner,* 23 *N.J.* 193, 203 (1957).

■ The specific elements to be applied in any given case of a seller's breach of an executory agreement to sell realty may vary in order to achieve the broad purposes of reparations; some items, however, will almost invariably exist. Thus the purchaser will usually be entitled to the return of the amount paid on the purchase price with interest thereon. Costs and expenses incurred in connection with the proposed acquisition, such as for the title search and survey, would fall in the same category. The traditional test is the difference between the market price of the property at the time of the breach and the contract price. *Ganger v. Moffett,* 8 *N.J.* 73, 79 (1951); *King v. Ruckman,* 24 *N.J.Eq.* 298 (Ch.), *aff'd,* 24 *N.J.Eq.* 556 (E. & A. 1873). See cases cited in annotation, "Measure of recovery by vendee under executory contract for purchase of real property where vendor is unable to convey," 48 *A.L.R.* 12, 15–17 (1927). Under this standard the buyer who had taken possession before title passed would be entitled to recover for improvements he made that increased the value of the property. *Sabaugh v. Schrieber,* 87 *Ind.App.* 588, 162 *N.E.* 248 (1928).

■ The difference between market and contract price may not be suitable in all situations. Thus where a buyer had in turn contracted to sell the realty, it is reasonable to measure his damages in terms of the actual lost profit. *See Bonhard v. Gindin,* 104 *N.J.L.* 599 (E. & A. 1928) (awarding the consideration paid, search fees, taxes and assessments paid, and lost profits from a sale to a third person); *see also Giumarra v. Harrington Heights, Inc.,* 33 *N.J.Super.* 178 (App.Div.1954) *aff'd*

*o.b.*, 18 *N.J.* 548 (1955) (awarding contract buyer of realty lost profits in action against contract buyer's assignee). What the proper elements of damage are depend upon the particular circumstances surrounding the transaction, especially the terms, conditions and nature of the agreement.

The plaintiffs here assert that their damages are equivalent to the difference in interest costs incurred by them in purchasing a different home at another location. This claim assumes that the financial provision of the contract concerning the purchase money mortgage that the defendant agreed to accept was independent and divisible from the purchase of the land and house. The defendant contends that he did not agree to loan these funds in connection with the purchase of some other property, but that this provision was incidental to the sale of the house. Neither position is entirely sound. This financing was an integral part of the transaction. It can be neither ignored nor viewed as an isolated element.

The relationship of the financing to the purchase of a home has changed in recent years. As interest rates rose and the availability of first mortgage funds was sharply reduced, potential homeowners, though desirous of purchasing homes, found financing difficult to obtain. The seller's acceptance of a purchase money mortgage became an important factor in effecting a sale. *See* Rand, "Home Resale Market: Pattern Shift," *N.Y. Times,* March 22, 1981, § 11, at 18, col. 3. In evaluating a contract such a financial arrangement could play an important part in determining price.[7] The rise in interest rates, the expense of mortgage credit and the availability of funds has rendered traditional methods of financing acquisition of homes

[7]The purchase money mortgage arrangement is to be differentiated from the situation where the seller is to receive all cash and the buyer obtains a mortgage from a lending institution. The financial responsibility of the buyer is probably a critical element. Even in the latter situation the price may be affected slightly if the seller must contribute some consideration to obtain the mortgage.

impractical. Walleser, "The Changing Complexion of Home Mortgage Financing in America," 31 *Drake L. Rev.* 1, 2 (1981). Favorable vendor financing could lead to increased market value. Only then might a buyer be able to purchase. Iezman, "Alternative Mortgage Instruments: Their Effect on Residential Financing," 10 *Real Est. L.J.* 3, 4 (1981). The importance of a seller's purchase money mortgage to the overall agreement to convey property was recognized in *King v. Ruckman,* 24 *N.J.Eq.* 298 (Ch.), *aff'd,* 24 *N.J.Eq.* 556 (E. & A. 1873). The seller agreed to convey certain property and to accept as part of the purchase price a purchase money mortgage with 6% interest payable in five annual installments. The seller refused to convey. The buyer obtained a final decree for specific performance including the purchase money mortgage. The Chancery Court's view of the mortgage confirmed by the Court of Errors and Appeals on review was:

> The benefit accruing to the purchaser from having time for the payment of the bulk of the principal, and of the rate agreed on for interest, is apparent. It is a material ingredient of the bargain, as much so in reality, though not in degree, as the price, and cannot be withheld from the purchaser in this case by the willful misconduct of the vendor, for the sole benefit of the vendor himself. [24 *N.J.Eq.* at 303]

The interest rate is not sufficiently discrete to calculate damages in terms of it alone under these circumstances.

In some circumstances interest rate differentials are an appropriate measure of damages. Where the buyer has obtained specific performance, but because of the delay has incurred higher mortgage rates, then his loss clearly should include the higher financing cost. *Godwin v. Lindbert,* 101 *Mich.App.* 754, 300 *N.W.*2d 514 (1981), is illustrative. The buyers lost their commitment for a mortgage with an interest rate of 8¾% when the seller refused to convey. The buyers succeeded in obtaining specific performance but were compelled to borrow funds at 11½%. They were awarded the difference reduced to present value. *See also Reis v. Sparks,* 547 *F.*2d 236 (4th Cir.1976). Moreover, we are not unmindful of the possibility that a buyer might demonstrate that a lending institution's commitment to advance

the funds initially at a certain interest rate was due to the buyer's financial condition. The particular realty might well be a secondary and incidental consideration for the loan. Therefore an interest differential occasioned by the seller's default might be a proper factor in fixing damages where the buyer shortly thereafter purchased another property financed at a higher interest rate.

This is not such a situation. The defendant's motive was to sell a house and not to lend money. In measuring the plaintiffs' loss there should be a determination of the fair market value of the property and house that could be acquired with a purchase money mortgage in the principal amount of $44,000 at an interest rate of 10½% (no appeal was taken from the judgment of reformation) for a 30-year term. The valuation should be at the time the defendant failed to comply with the judgment of specific performance. The plaintiffs would be entitled to the difference between $58,900 and that fair market value. If the fair market value was not more than the contract price, the plaintiffs would not have established any damage ascribable to the loss of the bargain. They are also entitled to their expenditures for the survey, search, and counsel fees for services rendered in preparation of the aborted closing. The plaintiffs have hitherto received the return of the deposit.

The judgment of the Appellate Division is modified and, as so modified, remanded to the trial court for further proceedings consistent with this opinion.

O'HERN, J., dissenting.

I must respectfully dissent from the opinion and judgment of the Court. The issue is whether out of pocket costs or benefit of the bargain damages are to be awarded for breach of an executory contract for the sale of real estate when the contract does not close because of a defect in title unknown to the seller at the time of execution of the contract.

Although commentators advocate the adoption of the "American rule" as suggested by the majority, there remains sufficient flexibility in the rule that would except its application to the circumstances of this case. While both Williston and Corbin suggest that the only rule defensible on principle is allowing the purchaser the difference between the contract price and the market value of the land, it is put this way: the rule "is applied in every case where the vendor *breaks* his contract without legal excuse." 11 *Williston, Contracts* (3 ed. Jaeger 1968), § 1399 at 527 (emphasis supplied). *Accord,* 5 *Corbin, Contracts* (1964) § 1098 at 525. Most of the recent American cases cited in both treatises do not sustain a conclusion that such a rule would be applied to a case where the seller was wholly without fault with respect to the existence of a defect in title that prevents closing.[1]

---

111 *Williston, supra,* § 1399 at 527; 5 *Corbin, Contracts* (1964) § 1098 at 525; 5 *Corbin, Contracts* (2 Supp. Kaufman ed. 1982) §§ 1097–98 at 261–62; *F. Poss Farms, Inc. v. Miller,* 35 *Colo.App.* 152, 529 P.2d 1343 (Ct.App.1974) (benefit of bargain rule followed on repossession by seller after buyer defaulted in payments); *Horton v. O'Rourke,* 321 *So.*2d 612 (Fla.Dist.Ct.App.1975) (benefit of bargain denied; no bad faith where title unmarketable because of federal tax lien); *Sullivan v. Esterle,* 268 *S.W.*2d 919 (Ky.App.1954) (benefit of bargain allowed; vendor repeatedly promised deed for over three years knowing he was not sole owner of property); *Ky. Consumers Oil Co. v. General Bonded Warehousing Corp.,* 299 *Ky.* 161, 184 *S.W.*2d 972 (Ky.Ct.App. 1945) (lost profits allowed; seller knew of lease arrangements at time of contract but failed to discharge encumbrances as agreed); *Olszewski v. Sardynski,* 316 *Mass.* 715, 56 *N.E.*2d 607 (Sup.Ct.1944) (benefit of bargain approved in dictum; specific performance granted to vendor where buyer refused to pay); *Dunning v. Alfred H. Mayer Co.,* 483 *S.W.*2d 423 (Mo.App. 1972) (benefit of bargain allowed; vendor failed to construct dwelling per specifications of contract); *Bobst v. Sons,* 252 *S.W.*2d 303 (Mo.Sup.Ct.1952) (benefit of bargain allowed; vendor's spouse refused to sign deed for property held as tenants in entirety); *Heiman v. Bishop,* 272 *N.Y.* 83, 4 *N.E.*2d 944 (Ct.App.1936) (benefit of bargain not in issue; court examined methods of establishing mortgage deficiency in Depression-era case); *Missouri Slope Livestock Auction, Inc. v. Wachter,* 107 *N.W.*2d 349 (N.D.Sup.Ct.1961) (benefit of bargain allowed under statute; vendor did not actually have title); *Crahane v. Swan,* 212 *Or.* 143, 318 P.2d 942 (Sup.Ct.1957) (benefit of bargain allowed; vendors delayed seven years in clearing title to timber rights sold to

I believe that the rule the Court adopts can unnecessarily penalize the unwary. Although it is true that a skilled commercial conveyancer can draft provisions to protect a seller from the principle of law adopted by the Court, it is also true that many people enter residential real estate transactions without the benefit of counsel. Indeed, pursuant to the settlement agreement of *New Jersey State Bar Ass'n v. New Jersey Ass'n of Realtors,* 109 *N.J.L.J.* 473 (June 3, 1982), the Court will soon have to consider the approval of a proposal by the New Jersey State Bar Association and the New Jersey Board of Realtors that would permit brokers to draw real estate sales contracts under certain circumstances.[2] In New Jersey, a contract for sale of real estate of this type is a consumer contract and should be expressed in plain English, without legalisms, that ordinary people can understand. See *N.J.S.A.* 56:12–1 *et seq.* In my view, that policy is not furthered by a rule of law that leaves the ordinary homeowner to the consolation that better drafting would have dealt with the unforeseen consequences of an unknown title problem.

I would adhere to the rule that an award of damages should be just under the circumstances. In *Zeliff v. Sabatino,* 15 *N.J.* 70 (1954), this Court said:

> We rather are of the opinion that this State is not so inexorably wedded to the "out-of-pocket" rule as to the measure of damages that "the benefit-of-the-bargain" rule cannot be applied where justice requires. . . .

---

intervening option purchaser); *Bunnell v. Bills,* 13 *Utah* 2d 83, 368 *P.2d* 597 (Sup.Ct.1962) (benefit of bargain approved; seller refused to convey); *Reed v. Wadsworth,* 553 *P.2d* 1024 (Wyo.1976) (benefit of bargain allowed; seller sold to a third party after original purchaser refused to release seller from contract). *But see Capaldi v. Burlwood Realty Corp.,* 350 *Mass.* 765, 214 *N.E.2d* 71 (Sup.Ct.1966) (benefit of bargain allowed but lost profits and out of pocket expenses denied; vendor did not own all the land).

[2]In this case, the contract was the "Standard Form" adopted by the New Jersey Association of Realtor Boards, and although it provided "[t]itle to be conveyed shall be marketable and insurable, at regular rates, by any reputable title insurance company . . . ," it called only for a Bargain and Sale Deed with Covenants Against Grantor.

... The just method of determining damages necessarily varies with the facts of the particular case.... No rule of damages capable of precise application in all cases can be laid down and followed. [*Id.* at 74].

As originally stated the English rule would not allow recovery of benefit of the bargain under any circumstances, whether with or without fault on the part of the seller, the seller's liability being limited to recovery in an action at law where fraud or deceit is involved for the loss he may sustain thereby. *Gerbert v. Trustees,* 59 *N.J.L.* 160 (E. & A. 1896).

Commentators have observed that New Jersey has never blindly followed this so-called "English rule." Annotation, " 'Out of pocket' or 'benefit of bargain' as proper rule of damages for fraudulent representations inducing contract for the transfer of property," 13 *A.L.R.3d* 875, 927–31 (1967) (classifying New Jersey as a jurisdiction adopting equitable or flexible rule); III *American Law of Property* § 11.67 at 169 (A. Casner ed. 1952) (English rule followed with qualifications). New Jersey has adopted a modified version of the English rule whereby benefit of bargain is recoverable for willful refusal to convey or other misconduct.[3]

---

[3]See *Ganger v. Moffett,* 8 *N.J.* 73 (1951) (benefit of bargain not in issue; dictum indicates that such damages would be available if a vendor unwarrantably refused to convey); *Rabinowitz v. Debow,* 104 *N.J.L.* 62 (E. & A. 1927) (benefit of bargain denied; vendor willing to convey but could not clear title defect; dictum indicates that such damages would be available for willful refusal to convey); *Brown v. Honniss,* 70 *N.J.L.* 260 (E. & A. 1904) (benefit of bargain allowed; "no allegation of any disability in the seller to convey but a refusal to convey for a totally inadequate reason") (at 264); *Gerbert v. Trustees,* 59 *N.J.L.* 160 (E. & A. 1896) (benefit of bargain denied; vendor through no fault of his own unable to convey title); *Melcer v. Zuck,* 95 *N.J.Super.* 252 (Ch.Div.1967), rev'd on other grounds 101 *N.J.Super.* 577 (App.Div.1968), certif. den. 52 *N.J.* 498 (1968) (benefit of bargain allowed; vendors refused to allow withholding of money to discharge liens); *King v. Ruckman,* 24 *N.J.Eq.* 298 (Ch.1873), aff'd 24 *N.J.Eq.* 556 (E. & A. 1873) (benefit of bargain allowed; vendor unwarrantably refused to convey and court adopted *Drake* rule); *Drake v. Baker,* 34 *N.J.L.* 358 (Sup.Ct.1871), disapproved, *Gerbert,* 59 *N.J.L.* at 180–82 (benefit of bargain allowed; exceptions to English rule for willful default or known contingencies assumed, but not for unknown title defect).

A rule of damages in a residential real estate sales contract should reflect the broader policies of law in ordering consumer transactions, and seek "to effectuate the reasonable expectations" of the parties. *Cf. Kievit v. Loyal Protective Life Ins. Co.,* 34 *N.J.* 475, 488–89 (1961) (construction of accident insurance policy).

If any modifications of existing law were to be made under the circumstances of this case, I would recommend that the Court follow the recommendations of the Commissioners on Uniform State Laws. They suggest the adoption of a rule that better conforms with prevailing American decisional law and reflects a "just method of determining damages." *Zeliff v. Sabatino,* 15 *N.J.* at 74. That rule is stated as follows:

Section 2–510 [Buyer's Damages for Seller's Failure to Convey]

(a) Except as provided in subsection (b), the measure of damages for a seller's repudiation or wrongful failure to convey is the difference between the fair market value at the time for conveyance and the contract price and any incidental and consequential damages (Section 2–514), less expenses avoided because of the seller's breach.

(b) Unless the title defect is an encumbrance securing an obligation to pay money which could be discharged by application of all or a portion of the purchase price, if a seller is unable to convey because of a title defect of which the seller had no knowledge at the time of entering into the contract, the buyer is entitled only to restitution of any amounts paid on the contract price and incidental damages (Section 2–514). [Unif. Land Transactions Act § 2–510, 13 *U.L.A.* 638 (1980)].

If I were to reach the issue of increased financing costs, I would agree with the majority that such are appropriate for consideration. See Note, "Real Estate Purchaser Entitled to Increased Mortgage Interest Costs as Damages from Seller Who

---

While in this case the Appellate Division applied loss of the bargain damages to a situation where the vendor did not own or have a contract to acquire the property, it is clear the person possessing a record title (Lowden) stood in a joint relationship with the seller (Bachstadt) and was prepared to make title at the time of closing had there not been a defect. The majority does not assert that there is any exception to the rule of damages on account of the seller's failure to possess title at the time seller entered the contract. The Court also does not rely upon the fact that the seller was a builder.

Breaches Sales Contract," 12 *Seton Hall L.Rev.* 916 (1982). For an analysis of drafting considerations, see Garland, "Purchaser's Interest Rate Increases: *Caveat Venditor,*" 27 *N.Y.L.Sch.L.Rev.* 745 (1983) (forthcoming) (manuscript copy available at Seton Hall Law Review), referred to in Note, *supra.*

I would, however, reverse and reinstate the trial court's judgment.

*For affirmance*—Chief Justice WILENTZ and Justices PASHMAN, CLIFFORD, SCHREIBER, HANDLER, POLLOCK—6.

*For reversal and reinstatement*—Justice O'HERN—1.